# EXHIBIT A

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
WAKE COUNTY      SUPERIOR COURT DIVISION
     25CVS _____

| | | |
|---|---|---|
| MADELEINE YOLANDE STAFFORD, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | **COMPLAINT** |
| v. | ) | **(JURY TRIAL DEMANDED)** |
| | ) | |
| FOUNDATION FOR THE PRESERVATION OF THE MAHAYANA TRADITION, INC.; THE KADAMPA CENTER; and MILAREPA CENTER, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**NOW COMES** the Plaintiff, by and through undersigned counsel, to hereby complain of the Defendants by alleging and saying as follows:

## PRELIMINARY STATEMENT

1.      This lawsuit arises out of the child sexual abuse suffered by Plaintiff Madeleine Yolande Stafford ("Stafford" or "Plaintiff") at the hands of employees and agents of defendants the Foundation for the Preservation of the Mahayana Tradition, Inc. ("FPMT"), The Kadampa Center and Milarepa Center (together, "FPMT Defendants").

2.      FPMT was founded in 1975 by the now deceased leaders Lama Thubten Yeshe ("Lama Yeshe") and Lama Thubten Zopa ("Lama Zopa"). FPMT's primary organizational mission is to promote a doctrine of Buddhism taught by Lama Zopa and Lama Yeshe.

3.      Between the ages of ten and sixteen, Stafford was sexually molested at the FPMT Kadampa Center in North Carolina and the FPMT Milarepa Center in Vermont, by FPMT Defendants' agents and employees.

1

4. One FPMT employee, Sangpo Sherpa ("Sangpo"), displayed an outsized sexual interest in the young child in full view of other FPMT members, and for a period of six years, took her into the woods to touch her intimate areas over and under her clothes during annual FPMT retreats. Sangpo was the personal attendant of Lama Zopa, enjoying an elite, protected role in the organization.

5. Another FPMT employee, Tenzin Gyaltsen ("Gyaltsen"), molested Stafford in a public hallway in the Milarepa Center, in full view of other FPMT members. Gyaltsen was the personal attendant of a FPMT senior teacher, Dagri Rinpoche ("Dagri").

6. Despite being abused as a child for years in plain sight, Stafford received no protection from FPMT Defendants. Indeed, FPMT Defendants allowed Sangpo and Gyaltsen access to Stafford and immunized them from the consequences of their abuse.

7. Due to FPMT Defendants' tortious conduct in trafficking Stafford and negligently failing to prevent, and indeed enabling and facilitating, child sexual abuse, Stafford suffers from lifelong emotional, physical, psychological, and financial damage.

8. This action alleges emotional and psychological injuries suffered as a result of conduct which would constitute assault and battery, negligence and gross negligence, intentional infliction of emotional distress and breach of fiduciary duty under North Carolina law, negligence and gross negligence, breach of fiduciary duty and failure to prevent harm under Vermont law and federal sex trafficking, as defined by 18 USC §§ 1591, 1594 and 1595.

## **PARTIES**

9. Stafford is an adult person and was at all material times a resident of New Hampshire, Maine, North Carolina and California. At the time of the events complained of herein,

2

Stafford was a volunteer, student and member of FPMT and frequented events at The Kadampa Center, located in Raleigh, North Carolina and Milarepa Center, located in Barnet, Vermont.

10. Defendant Foundation For The Preservation Of The Mahayana Tradition, Inc. d/b/a FPMT is a non-profit organization, duly organized and existing under the laws of California. Its organizational headquarters is located in Portland, Oregon. It owns and operates centers across the United States, including The Kadampa Center in North Carolina and Milarepa Center in Vermont.

11. Defendant The Kadampa Center is a non-profit organization, duly organized and existing under the laws of North Carolina. Its organizational headquarters is located in Raleigh, NC. On information and belief, FPMT controls the management and operations of The Kadampa Center.

12. Defendant Milarepa Center is a non-profit organization, duly organized and existing under the laws of Vermont. Its organizational headquarters is located in Barnet, VT. On information and belief, FPMT controls the management and operations of Milarepa Center.

## JURISDICTION AND VENUE

13. Subject matter jurisdiction over this cause is conferred upon and vested in this Court under and by virtue of, inter alia, N.C.G.S. § 7A-240 and N.C.G.S. § 7A-243.

14. Personal jurisdiction over the Defendants is vested in this Court under and by virtue of, inter alia, N.C.G.S § 1-77, and N.C.G.S. § 1-82.

15. The Defendants have been properly brought before the Court in accordance with Rule 4 of the North Carolina Rules of Civil Procedure.

3

16.     Venue is appropriate in Wake County because Defendant Kadampa Center is located in Wake County.

## FACTUAL ALLEGATIONS

### FPMT Recruits Stafford

17.     FPMT was founded in 1975 by Kama Thubten Yeshe ("Lama Yeshe") and Lama Thubten Zopa ("Lama Zopa"). In 1983, they incorporated FPMT in California as a non-profit public benefit corporation.

18.     Initially operating primarily out of Nepal, FPMT targeted young Europeans and North Americans travelling to Asia and rapidly expanded internationally.

19.     FPMT's International Office, its organizational headquarters, is based in Portland, Oregon. FPMT runs over a hundred centers, study groups, and services around the world.

20.     FPMT's organizational mission is to promote a doctrine of Buddhism taught by Lama Zopa and Lama Yeshe. The organization decrees loyalty to FPMT's leadership as essential for achieving enlightenment. The need to please FPMT's leaders and teachers is a constant refrain in FPMT gatherings, courses, and published material.

21.     Stafford was born in 2000 to Mer and Troy Stafford and named Madeleine.

22.     Stafford first encountered FPMT in 2008, when her family was living in Peterborough, New Hampshire. A group of Buddhist monks were conducting a fundraising event at the Mariposa Museum in Peterborough and had constructed an elaborate 'mandala' design out of sand, which fascinated her. The group of visiting monks suggested that Mer take Stafford to a nearby Buddhist center so she could explore her apparent interest in Buddhism.

4

23.     A couple of weeks after her experiences in Peterborough, Stafford and her mother joined the Kurukulla Center for Tibetan Studies (the "Kurukulla Center"), an FPMT-run institution in Medford, Massachusetts.

24.     Over time, both Stafford and her parents became increasingly involved with both the Kurukulla Center, and FPMT more broadly. When they relocated to Maine in 2009, they left friends and family behind, and the FPMT community there became central to their personal and professional lives.

25.     In 2009, FPMT offered Mer a paid position to assist with preserving and publishing the teachings of Lama Yeshe and Lama Zopa. This job bound the Stafford family more tightly to FPMT.

**Senior FPMT Figures Were Credibly Accused of Sexual Abuse Before Stafford Joined the Organization, Without Any Consequences**

*Lama Zopa Dismisses Concerns About Sexual Abuse*

26.     For more than two decades, Lama Zopa, FPMT's leader, has minimized sexual abuse of FPMT members by its leading figures, going so far as to mock child sexual abuse victims and argue that their ordeals stemmed from their own "bad karma."

27.     In 2000, Lama Zopa told an FPMT member whose father abused her as a child that what she experienced was "nothing." He told her that her suffering was due to her own past, and that blaming her father for it was merely "an ego trip."

28.     In other letters of advice to his students, Lama Zopa similarly told a woman who had been physically, verbally, and emotionally abused by her husband for years that the abuse was

5

retribution for suffering she had herself caused her husband in another life. He counseled her to accept the abuse without anger.

29. During a retreat in 2017, which Stafford attended, Zopa publicly mocked people who looked at sex with children as abuse. He cautioned that speaking out against child sexual abuse "harm[s] the holy mind of the Buddha."

30. This attitude at the top set up a pervasive system of sexual abuse by senior FPMT figures, even before Stafford joined the organization.

*FPMT Knew Its Senior Teacher Dagri Was A Sexual Abuser Since At Least 2010*

31. In October 2008, a young woman, Jane Doe 1,[1] accused Dagri of sexually abusing her at an FPMT center in India. Doe 1 accused Dagri of sexually touching her buttocks under and over her clothing and attempting to fondle her breasts on the pretext of offering her spiritual advice to deal with her back pain.

32. Doe 1 reported the assault to the Indian police.

33. Over the next two years, Doe 1 reported the abuse both verbally and in writing to several senior FPMT officials. Other senior nuns discussed the problem of sexual assault by lamas, and particularly Dagri, with Kunsang.

34. Despite Doe 1's report, FPMT did not investigate Dagri's conduct, nor did it supervise or discipline him in any manner. FPMT continued to host Dagri at various international FPMT centers, assign women as servants to him, and place them alone with him in his private

---

[1] Due to the sensitivity of sexual abuse allegations, Plaintiffs have withheld the names of the relevant witnesses in this complaint. However, these names are well known to FPMT Defendants.

quarters. Indeed, Doe 1 was so frustrated with FPMT's non-response that she escalated her report to the Dalai Lama.

35.     In October 2010, another young nun, Jane Doe 2, alleged sexual assault by Dagri. FPMT had assigned Doe 2 to work for Dagri as a servant during an FPMT event in Australia.

36.     Doe 2 alleged that Dagri groped her while she was serving him tea in his room. The assault took place during an FPMT national meeting where Dagri was the keynote speaker.

37.     Doe 2 reported the assault at once to a senior FPMT registered teacher, and then emailed her complaint to Kunsang and FPMT Executive Director Claire Isitt.

38.     FPMT acknowledged in an email response to Doe 2 that it found her credible. However, despite two independent sexual abuse complaints, it remained steadfast in refusing to supervise or discipline Dagri, its exalted teacher, in any way.

39.     FPMT has admitted on its own website that it was aware of Doe 2's allegations from 2010, and of Doe 1's allegations no later than 2011.

40.     Despite these credible allegations, FPMT repeatedly doubled down on its support of Dagri and did not put effective policies or practices in place to protect women from sexual predation by him or other senior figures. Indeed, according to Doe 1, after she accused Dagri of abuse, FPMT leaders and members attempted to discredit her, accused her of mental problems and distorted her statements. FPMT also falsely stated it had investigated and resolved her complaints.

41.     Doe 1 further stated in written statements that FPMT had been aware of sexual misconduct within the organization since the 1980s.

**Stafford Innocently Enters This Dangerous Environment and is Immediately Groomed**

42.     Stafford was a bright, curious and eager child. She came to the attention of Wendy Cook, the then director of the Kurukulla Center, and Nick Ribush, a longtime member of its Board. They believed Stafford showed great promise and, despite her young age, encouraged her to attend lectures and activities designed for the Center's adult members.

43.     In September 2010, when Stafford was 10 years old, Ribush invited her to a ceremony to formally commit to FPMT. This process, known as "taking refuge," was conducted at FPMT's Milarepa Center in Barnet, Vermont.

44.     The Milarepa Center is the cornerstone of FPMT. Lama Zopa hand-picked its director Martha Tack in 1989, then replaced her in 1994 with Peter Brown, and over the years instructed all of its directors repeatedly about how to manage it.

45.     Ordinarily, Stafford would have been considered too young and underqualified in Buddhist studies to participate in such an advanced ceremony. However, Ribush pulled strings and directly contacted FPMT's CEO, Roger Kunsang ("Kunsang"), who granted Stafford special permission to participate.

46.     After that, Lama Zopa, FPMT's most senior leader, sought out Stafford's father, Troy, to tell him that his ten-year-old child was a "tulku" – a reincarnation of an enlightened being.

47.     Stafford's elevation to this exalted status occurred swiftly. Mere days after the refuge ceremony, the Stafford family was offered a private audience with Lama Zopa at the Kurukulla Center, a rare and highly prestigious honor within FPMT.

48.    Two weeks later, Stafford and her mother, Mer, were invited and encouraged to travel to North Carolina to join FPMT's annual intensive two-week retreat, where Stafford was welcomed with awe and praise.

**Lama Zopa Introduces Stafford to her First Assailant: Sangpo Sherpa**

49.    During the Staffords' private audience with Lama Zopa, he told Stafford's parents that they needed to cede control over decisions about her future to FPMT.

50.    Lama Zopa also told the Staffords that their daughter had formed a special bond with his attendant, Sangpo Sherpa ("Sangpo"), an employee of FPMT Defendants. He announced that Stafford and Sangpo were linked cosmically, and had, in a past life, perhaps been husband and wife.

51.    Attendants to spiritual leaders, such as Sangpo, have special status in FPMT. They attend to the leader's every demand, acting as a valet, butler, personal assistant, social secretary, and gatekeeper between the exalted teacher and those who seek their time and attention.

52.    Within FPMT, attendants are highly privileged because of their proximity and influence over the leaders they serve like Lama Zopa or Dagri. FPMT literature frequently describes attendants as extensions of the leaders they serve.

53.    By employing him as attendant, FPMT Defendants vouched for Sangpo's stature and trustworthiness. Lama Zopa's endorsement of Sangpo in particular as a cosmically-linked mentor and guide to Stafford, indeed her possible husband in a previous life, further reassured her parents that she was in good hands.

54.    Over the next six years, Sangpo groomed and repeatedly sexually abused Stafford.

9

**Sangpo Assaults Stafford at a 2010 FPMT Retreat in North Carolina**

55.     In or around September 2010, Stafford and Mer travelled to FPMT's Kadampa Center in Raleigh, North Carolina to attend FPMT's "Light of the Path" retreat.

56.     The Light of the Path retreat is FPMT's flagship annual gathering, attended by members from North America and around the globe. To highlight its importance, Lama Zopa himself hosted a two-week immersion program at the retreat.

57.     Although this was an FPMT-wide retreat, the Kadampa Center took primary responsibility for organizing, overseeing and hosting the event. They did this in close collaboration with FPMT, who closely supervised every aspect of the event, controlled the schedule, provided the teachers and star guests, including Lama Zopa, and solicited donations from members.

58.     The retreat was hosted at the YMCA Blue Ridge, located in Black Mountain, North Carolina.

59.     FPMT housed Stafford among the adults at the retreat. Lama Zopa also actively encouraged Stafford to participate in teachings and trainings for adults.

60.     Early in the retreat, Sangpo gave Stafford a note with his WeChat contact details so they could communicate privately.

61.     At the start of each day of the retreat, with hundreds in attendance, Lama Zopa would walk in, escorted by Sangpo and Kunsang.

62.     On one of these mornings, as Lama Zopa, Kunsang and Sangpo entered the hall and walked down the aisle, Sangpo reached over to Stafford as he passed her. He placed his arm around Stafford and had Stafford accompany him and Kunsang on the remainder of the stately

walk to the front of the hall. Everyone saw this, cementing Stafford's exalted status to the whole organization.

63.     Starting with this incident, FPMT members treated Stafford as a celebrity. Some sought to photograph her. Others gushed to her parents how fortunate they were to have such a wonderful child. Stafford was included in settings with FPMT dignitaries where ordinary members could not go and accorded VIP status generally.

64.     The popularity of the 2010 Light of the Path Retreat meant the facilities were crowded, and guests had very little privacy. However, due to Stafford's special status, she was given free access to the private cabin where Lama Zopa stayed with his inner circle, including Kunsang and Sangpo.

65.     Lama Zopa and Sangpo encouraged Stafford to help in the kitchen and eat the special food prepared for Lama Zopa, which was superior to the food provided to ordinary attendees.

66.     Stafford's parents were not permitted to enter the cabin freely, so they were not able to supervise her there.

67.     Sangpo took advantage of Stafford's isolation.

68.     At one point, he led her outside of the cabin where he and she had been with other senior FPMT figures along a path to the woods, taking her to a look-out spot where he instructed her to sit on a flat rock.

69.     Then, Sangpo sat beside Stafford, reached over, and began to touch the ten-year-old's breasts. As Sangpo groped Stafford, he started discussing Buddhist philosophy.

11

70.     This method of abuse – sexually molesting someone while maintaining a veneer of religious authority – was identical to the well-documented modus operandi of Dagri, whom Sangpo served as attendant, and who FPMT Defendants were already aware had credibly been accused of abuse (see above starting at Paragraph 31).

71.     On information and belief, Sangpo had picked up his technique of abuse from FPMT's senior leaders and knew from Dagri's experience of escaping accountability how to maximize his own chance of doing so.

72.     At ten years old, Stafford did not understand Sangpo's molestation as inappropriate.

73.     For the rest of the two-week retreat, Sangpo repeatedly escorted Stafford out of Lama Zopa's cabin and into the woods for similar abuse. Once Sangpo had Stafford to himself at the lookout point, he subjected her to the same form of inappropriate sexual touching almost daily during the two-week retreat. At times, Sangpo slipped his hand under Stafford's clothing to touch Stafford's bare breasts. Other times, he fondled them over Stafford's clothing.

74.     Each of Sangpo's acts of molestation originated with luring Stafford out of FPMT's most senior leader's private cabin, and yet, no one stopped them. No one commented on their spending so much time alone in the woods. None of the adults present in the cabin questioned these extended and private interactions between a man and a ten-year-old child.

75.     Sangpo and FPMT had groomed Stafford for this repeated abuse by saying that Sangpo and Stafford had been connected in a previous life, possibly as husband and wife, by elevating her rapidly to celebrity status, by isolating her from her parents and other adults, and by veiling Sangpo's abuse with Buddhist teachings.

**An FPMT Member Stalks Stafford for Sex**

76.     Sangpo's abuse was only the first in a long series of predations, molestations and abuse that Stafford suffered at FPMT.

77.     In or around 2011, when Stafford was 11, Cook, ex-director of the Kurukulla Center, called up the Staffords one night to alert them that a man from the Kurukulla Center was out looking for Stafford, and wished to have sex with her.

78.     The stalker was an active and highly devoted FPMT member who frequented the Kurukulla Center. As such, he would have been fully aware of Stafford's elevated status. Indeed, his obsession with Stafford was cast in those special terms. Cook told the Staffords that the man believed that Stafford was "destined" to be his "consort."

79.     It was clear that Lama Zopa and FPMT's special treatment of Stafford had sexualized Stafford to at least some of its members. By presenting Stafford to the FPMT community as a "tulku" whose divine purpose was to exalt and continue their organization, FPMT's actions had encouraged inappropriate stalking behavior among its adherents.

80.     Cook later told the Staffords that they had located Stafford's stalker and had "spoken to him," so they could stop worrying.

81.     As far as Stafford knows, FPMT did not alert the authorities about this potential act of child sexual abuse.  It did nothing following the incident to supervise or protect Stafford to ensure other members did not pursue her for sex in a similar way.

**Yet Another FPMT Employee, Tenzin Gyaltsen, Assaults Stafford**

82.     In July 2011, the Staffords attended a ten-day public event in Washington D.C. with the Dalai Lama.  Also present were Dagri, the FPMT teacher who FPMT Defendants knew at the

13

time had been credibly accused of sexual abuse (Paragraph 31 *et seq*. above) and his attendant, Tenzin Gyaltsen.

83. Stafford was 11 years old.

84. On the last night of the gathering, Maude Stafford, the youngest Stafford child, had an unexpected seizure. As she lay in the hospital, the family received a phone call from Amy Miller, the then director of the Milarepa Center. Miller was a longtime FPMT teacher and was close to Lama Zopa.

85. Miller said that Dagri had heard of Maude's seizures and diagnosed them as the work of a dangerous harmful spirit. He had begun spiritual interventions to help her. Miller told the family that they needed to bring Maude to Dagri immediately for spiritual healing at the Milarepa Center.

86. Worried for their daughter's health, and grateful for Dagri's attention, the parents immediately complied.

87. Despite FPMT's awareness of Dagri's history of sexual transgressions, as detailed above, the organization had taken no steps to warn its members about this. FPMT instead chose to bolster Dagri by placing him on the approved teachers list. As a result, Stafford's parents had no idea when they took their children to see Dagri that he had been accused by numerous women of sexual predation. On information and belief, his attendant, Gyaltsen, however, was certainly well aware of it.

88. Gyaltsen had been a pupil of Dagri from a young age, serving as his attendant for many years, residing with Dagri and traveling with him on his international teaching tours. Gyaltsen was attending to Dagri when his first assault became publicly known in India and was

with him in Australia when the second assault was reported to the FPMT. Gyaltsen was Dagri's closest associate. He helped coordinate Dagri's response to the allegations and also managed his email correspondence, and as such likely knew that the assaults had been reported to FPMT.

89.     Gyaltsen knew or should have known from direct experience that FPMT continued to exalt, promote and host Dagri despite assault allegations against him. On information and belief, Gyaltsen was aware of the culture of impunity FPMT fostered around sexual abuse.

90.     On July 24, 2011, after the Staffords had gone to the Milarepa Center to get help for Maude for her seizure, Stafford walked up to Gyaltsen outside Dagri's quarters to request a chance to ask a question of Dagri. Gyaltsen told Stafford that she must first tell him the question. As Stafford responded, Gyaltsen suddenly grabbed her, pulling the child's back against his front and pressing his groin against her. He groped Stafford's breasts as he did so.

91.     Gyaltsen persisted in fondling and pressing the child's body up against his genitals for several minutes.

92.     While this went on, Stafford looked around and saw several members of the Milarepa Center observing this interaction from further down the hall.

93.     They did not intervene. Nobody at FPMT raised this incident with Stafford's parents, and Gyaltsen was never investigated or disciplined for it.

### FPMT Isolates Stafford from Other Children and from her School

94.     In 2013, when Stafford was 13 years of age, she moved to North Carolina with her parents, to work more closely with the Kadampa Center and FPMT's operations in that state.

95.    By this time, she had been stalked and/or sexually abused by at least three members of FPMT – Sangpo, Gyaltsen and the stalker at the Kurukulla Center. Though she was too young to recognize the FPMT members' behavior as abuse, it was already hurting her mental health, social life and school performance. She escalated a behavior she had begun when she was just 12 years old – cutting herself.

96.    In August 2013, Stafford wrote a letter to Lama Zopa, saying that she did not fit in at school and asking for guidance because she felt sad, confused, and emotionally unstable.

97.    Lama Zopa responded in October 2013, directing his reply to Stafford's mother. He stressed that it was very important Stafford do the Buddhist practices he specified, at a "conducive place."

98.    Lama Zopa warned Stafford's family to insulate her from the "corrupting influences" of school, friends of the same age, and popular media. He suggested Stafford become a nun and live at an FPMT center in Soquel, California called Land of Medicine Buddha, where she would make regular visits to Lama Zopa's house nearby.

99.    In fact, this was a further attempt to control Stafford for the malign purposes of FPMT's senior leaders.  They wanted her to be under their full-time control, always supervised by FPMT members, and deprived of normal contact with age-appropriate behavior and of peers in whom she might have felt comfortable confiding the abuse of senior FPMT figures.

100.    Hopeful that Lama Zopa's guidance would aid Stafford, her parents moved in 2014 to California. There, they placed her in a hybrid school permitting substantial home schooling, partially accomplishing FPMT's goal of keeping her isolated and susceptible to further abuse.

## Sangpo's Assaults on Stafford Continue

101.    After his first acts of molestation at the retreat in 2010, Sangpo continued to interact inappropriately with Stafford, grooming her for further sexual abuse.

102.    In May 2014, FPMT and the Kadampa Center resumed hosting Light of the Path Retreats.

103.    Stafford was 14 years old at this time.

104.    Stafford attended this retreat. Once again, Sangpo took her on private walks to the same lookout spot and resumed touching her breasts. Sangpo inserted his hands under Stafford's clothing and fondled her breasts both under and over her clothes, while speaking casually of spiritual matters.

105.    As before, several members of FPMT spotted Stafford and Sangpo disappear into the woods together.

106.    Most notably, FPMT COO François Lecointre and his wife, Violette, witnessed Stafford and Sangpo walk into the woods and later walked past them sitting together at the lookout point. They did not intervene. As Lama Zopa's attendant, it was apparent that Sangpo was assumed beyond reproach or comment by most of FPMT's community.

107.    Sangpo's interest in Stafford was unusual and in plain sight. For years, he frequently posted images of Stafford on his Facebook page. At large FPMT events in the Kurukulla Center, Sangpo would beckon Stafford to sit with him outside the event space, often in full view of other FPMT members. The two walking, with Sangpo's arm around Stafford's shoulders, was a common sight at the Kurukulla Center.

17

108.     Outsiders knew of Sangpo's unusual connection with Stafford too. For example, Yangsi Rinpoche, a respected Professor of Buddhist Studies at Maitripa College in Oregon, arranged for Sangpo and Stafford to participate in a ceremony together, even though he had never met her.

**Stafford Shows More Acute Signs of Abuse, and Receives No Help from FPMT**

109.     After the Stafford family moved to California at FPMT's behest in August 2014, they soon discovered Stafford's increasing signs of agitation, including her acts of self harm.

110.      Deeply concerned, Mer reached out to Lama Zopa and the FPMT community for advice.

111.     This time, Lama Zopa did not respond directly. Instead, Holly Ansett, secretary to FPMT CEO Kunsang, spoke to Mer on the phone.

112.     Ansett flagged to Mer that self-harm was often a reaction to sexual abuse. Mer was horrified at the suggestion and told Ansett she did not see how this could be the case when Stafford was homeschooled and interacted primarily with FPMT monks.

113.     Despite acknowledging that there were the clear indications that Stafford was being harmed, Ansett did not undertake any further action to counsel, supervise, or monitor Stafford or the adults who interacted with her at FPMT, despite the unusual interest shown in her by older men in FPMT.

**More Abuse by Sangpo**

114.     In August 2016, at age 16, Stafford attended yet another Light of the Path Retreat organized and orchestrated by the Kadampa Center in collaboration with FPMT.

115.    Just as in previous years, Stafford was given free run of Lama Zopa's private residence, off limits to other attendees.

116.    Sangpo was there, ready to resume his predation. He continued his pattern of luring Stafford every few days from Lama Zopa's cabin to the lookout spot, groping Stafford's breasts.

117.    This time, Sangpo was more secretive about his movements, telling Stafford that Kunsang was monitoring him, indicating that FPMT was by now aware of his illegal acts. Yet no effort was made to investigate, discipline, control or monitor Sangpo, or otherwise warn, assist or protect Staford.

**Stafford Reports Her Abuse to FPMT**

118.    At some point in 2018, Stafford watched a film in which a girl is molested by her piano teacher. The experience triggered a panic attack, and Stafford began to realize what she had experienced at FPMT was in fact sexual abuse. Stafford disclosed Gyaltsen's abuse to her mother. However, still reeling from the effects of Sangpo's grooming, and still believing that he was her friend, she did not disclose Sangpo's actions to anyone.

119.    Mer Stafford was horrified. On June 16, 2019, she reported Stafford's abuse by Gyaltsen in a letter addressed to Kunsang, President and CEO of FPMT.

120.    On June 19, 2019, CEO Kunsang noted that the allegations were "quite serious" and did not dispute their veracity. He displaced responsibility, however, to the individual FPMT centers, and contended that although FPMT had ethical guidelines in place, it had no duty to enforce them at the centers and retreats it operated or over the employees it controlled.

121.    Kunsang's words were directly contradicted by FPMT's own Ethical Policy, published on its website and periodically updated since 2000.  By its own terms, the policy applies

to "each person in a position of authority within the FPMT network" and mandates that they refrain from behavior that harms others. It further applies to "all activities, interactions, or communications including those online, on social media, by telephone, in person, or by any other means, as long as the activity, interaction, or communication in question concerns or pertains to FPMT-related actions, duties or responsibilities." Pursuant to the FPMT Ethical Policy:

> Each individual in a position of authority, within their area of responsibility in the FPMT organization, is also required to act on any appearance or complaint of misconduct. It is crucial that such individuals identify and express concerns about conduct that may be harmful, so that procedures for dealing with problems can be implemented.

122. Moreover, the FPMT website states that FPMT responds to any complaint by following a uniform procedure contained on a page titled "Problem Solving within the FPMT Organization."

123. In a further communication to Troy Stafford on October 4, 2019, CEO Kunsang nonetheless doubled down on disowning any FPMT responsibility for Stafford's abuse. He admitted that FPMT had received at least two prior reports of inappropriate sexual conduct by Dagri, and were thus aware of sexual abuse within the organization. He did not appear to question that Gyaltsen, Dagri's attendant, had molested her. He nonetheless told the Staffords to take up the problem up with individual center directors, despite FPMT's clear central management and control of the operations at the centers and of the conduct of senior FPMT attendants and employees.

124. Eventually, realizing how deeply she had been harmed, Stafford also came forward about Sangpo's abuse.

125. To this date, no one within FPMT has seriously acknowledged or apologized for the sustained abuse perpetrated on Stafford by its senior figures and employees.

126. On the contrary: instead of apologizing, FPMT retaliated against Mer.

127. On May 12, 2020, Kunsang wrote to Mer, advising that Lama Zopa had told her to step down from her position as Executive Director of Land of Medicine Buddha. Mer had always been devoted to FPMT, offering countless hours of labor at all hours for years. Mer's firing was a clear act of retaliation for reporting that senior FPMT figures had abused her daughter.

**Ample Notice: FPMT's Documented and Continuing History of Enabling, Facilitating and Allowing Sexual Abuse**

128. Stafford's assault at FPMT by senior figures and employees is part of a pattern long known to the organization. FPMT has a well-documented history of allowing, enabling and facilitating sexual abuse. Along with the actual and constructive notice it had of Stafford's own abuse, as detailed above, FPMT also had both actual and constructive notice of the foreseeable risk of sexual assault at its centers and retreats.

*Multiple Independent Investigations Document FPMT's Continued Failings*

129. Recent investigations of FPMT confirm that its problem of sexually abusing its adherents is of long standing, and has been known to senior figures and covered up for decades.

130. In or around May 2019, Indian police arrested Dagri after a woman alleged he had groped her during a flight from Delhi to Gagal.

131. Also in May 2019, a group of senior FPMT nuns circulated an online petition calling for an independent investigation into Dagri's regime of sexual abuse. The petition gathered

over 4,000 signatures, including from several FPMT employees. The nuns informed Kunsang that they were aware of numerous additional allegations of sexual assault by Dagri.

132.    FPMT responded by doubling down in its support of Dagri. Lama Zopa personally issued multiple public statements backing him, instructing FPMT members that Dagri was a holy being whose every act should be seen as a blessing. FPMT posted these statements on its website and drew attention to them in circulars sent to members.

133.    Eventually, however, public pressure and legal threats compelled Kunsang to engage with the numerous allegations. In October 2019, FPMT engaged the FaithTrust Institute ("FaithTrust"), a non-profit organization specializing in religious sexual abuse, to conduct an independent investigation.

134.    FaithTrust concluded, in a draft summary report, that by a preponderance of the evidence, five women, including Doe 1 and Doe 2 as detailed above, had credibly alleged Dagri of sexual assault from at least 2010, and that he had continued to abuse for years after FPMT had first received allegations against him.

135.    In the same draft summary report, FaithTrust also warned that Lama Zopa's statements and behavior had created a culture of impunity towards sexual abuse at FPMT, allowing FPMT to "defame and silence whistleblowers" and "place blame for any disruption onto those who speak up or complain about their experience of abuse." FPMT and Lama Zopa's teachings "perpetuate[d] the harmful belief that if a teacher abuses a student, it is the student's responsibility to use the teacher's behavior as a tool for deepening practice."

136.    Finally, FaithTrust also concluded that the "culture within FPMT…made it very difficult for complainants to feel supported and believed when coming forward with an allegation

of misconduct" and that it was "clear that FPMT leadership did not recognize their responsibilities in terms of stewarding information, receiving third-party complaints, or being told directly about an allegation." Where FPMT did have information, the report goes on to conclude, "they did not take swift or effective action, and/or did not have a clear mechanism through which to do so."

137. On information and belief, FPMT, to date, has not publicly released the full report from FaithTrust.

138. Faithtrust's conclusion was corroborated by another non-profit, a UK-based organization called Thirtyone:eight. In or around June 2019, while the investigation against Dagri was ongoing, FPMT consulted with Thirtyone:eight to audit its safeguarding policies. The FaithTrust institute received a copy of this report and, in its own report, noted that Thirtyone:eight had identified FPMT lacked key safeguarding policies to effectively protect vulnerable people from abuse.

139. Regardless of what the FaithTrust and Thirtyone:eight reports said, FPMT continued to stand by Dagri. In 2019, FPMT published two articles detailing Lama Zopa's "advice" for students of Dagri. He asserted that Dagri was to be considered a "very positive, holy being" and "definitely not an ordinary person." He directed students and members of FPMT to "rejoice" and ignore criticism of him, including allegations of sexual misconduct, and discredited the investigations that had confirmed this.

140. This expression of denial and suppression powerfully illustrates the dominant culture of FPMT, which by deliberately disregarding sexual abuse at all levels, has enabled it to go unchecked.

141.     Lama Zopa's public statements in favor of Dagri remained on FPMT website's website for several years, despite findings that they had contributed to a culture of sexual harm.

## PLAINTIFF'S DAMAGES

142.     As a result of Defendants' conduct, Plaintiff faced continual sexual abuse from powerful, even revered figures, between the ages of ten and sixteen that has caused serious and sustained trauma.

143.     Stafford encountered FPMT as a bright young child who soon became fluent in five languages, exhibited curiosity and acute intelligence, and was disciplined and self-motivated. She left FPMT with deep physical and psychological trauma and a journey of recovery that has put her life on hold.

144.     At the age of 12, Stafford began to self-harm. She lacerated her arms and legs multiple times a day for years. Stafford temporarily stopped self-harming when her parents noticed this behavior, but soon resumed, until around age 17. Stafford is now twenty-five years old and has continued to struggle with self-harm in moments of stress, anger, or pain. Stafford directly links this to the emotional turmoil she was facing from her childhood assaults.

145.     As a teenager, Stafford found herself unable to control her emotions. Her teachers noted a tendency towards explosive anger, often directed at her peers.  She became increasingly socially isolated, unable to make close friends. Even as an adult, Stafford suffers from severe social anxiety. She spent her childhood surrounded by adults at FPMT and now has difficulty connecting with individuals her own age.

146.     Stafford continues to suffer from serious depression and generalized anxiety disorder. She cries uncontrollably and often cannot muster the will to even move. She fears

discussing or imagining her future, because she feels trapped by what she describes as a "black void."

147.     Stafford traces her anxiety and panic to her first assault. Her symptoms range from a tightened chest, an inability to breathe, uncontrollable crying, to complete disassociation.  All these continue to the present day.

148.     Stafford is regularly plagued by insomnia, often unable to sleep through the night.

149.     Because FPMT insisted that "Western medicine" was unreliable, Stafford and her parents were discouraged from any sort of mental health treatment and medication. Instead, FPMT directed Stafford to Lama Zopa, who asked FPMT adherents to conduct certain rituals on her behalf. This blocked Stafford from seeking therapy until she was 20 years old, almost a decade after her trauma symptoms started.

150.     Stafford has been diagnosed with post-traumatic stress disorder (PTSD) and bipolar disorder. She has been prescribed medication for mood stabilization and sleep, as well as antidepressants and antipsychotics.

151.     Stafford has manic episodes in which she experiences auditory hallucinations, which began in 2011.

152.     Stafford was so depressed that she had to drop out of college and could not hold down apprenticeship positions or a full-time job.

153.     Stafford continues to suffer from intimacy issues.

154.     Stafford has long struggled with suicidal thoughts. In 2023, she was hospitalized due to suicidal behavior.

25

155.    Stafford is now under psychiatric care which will continue for the indefinite future.

156.    The harm that FPMT Defendants, their leaders and employees have done to Stafford is profound, serious and long-lasting.

## FIRST CLAIM FOR RELIEF – ASSAULT AND BATTERY

### North Carolina Common Law

*Plaintiff against FPMT and the Kadampa Center*

157.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

158.    Sangpo repeatedly and intentionally caused harmful and offensive contact to Stafford through repeated acts of molestation.

159.    Sangpo repeatedly and intentionally caused Stafford to reasonably fear imminent harmful and offensive contact to her person.

160.    As a direct and proximate result of Sangpo's assaults and batteries, Stafford has experienced severe psychological injuries, personal injuries, and egregious emotional and physical pain and suffering.

161.    Sangpo's actions were willful, wanton, malicious and reprehensible and were calculated to cause Stafford harm.

162.    Defendants FPMT and the Kadampa Center are liable for the assaults and batteries committed by Sangpo under the doctrine of respondeat superior.

163.    As a result of said assaults and batteries, Plaintiff is entitled to recover both compensatory and punitive damages from Defendants FPMT and the Kadampa Center.

26

## SECOND CLAIM FOR RELIEF - NEGLIGENCE & GROSS NEGLIGENCE

### North Carolina Common Law

### *Plaintiff against FPMT and the Kadampa Center*

164.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

165.   FPMT and the Kadampa Center owed a duty to exercise reasonable care in selecting, hiring, supervising, retaining and monitoring their agents and employees to provide for the well-being and safety of their students.  Further, FPMT and the Kadampa Center owed a duty to provide Stafford with a safe environment free from negligent and intentional harm.  FPMT and the Kadampa Center owed a duty to act as reasonable persons of ordinary prudence at all times relevant hereto.

166.   FPMT and the Kadampa Center were negligent, including in, but not limited to, the following ways:

a.   Failing to investigate Sangpo and his conduct prior to assigning him as attendant to Lama Zopa, and prior to Lama Zopa's endorsement of Sangpo as Stafford's mentor and guide;

b.   Failing their obligation to supervise Sangpo's conduct and contact with Stafford at FPMT and Kadampa Center's retreats and events beginning in 2010;

c.   Allowing Stafford unsupervised and unfettered access to adults-only quarters at FPMT retreats;

d.   Failing to investigate Sangpo and his conduct despite clear and obvious indications he had developed an inappropriate interest in Stafford and was attempting to spend an excessive amount of time in private with a minor child;

e.   Failing to detect and/or investigate ongoing inappropriate relationships between leaders, employees and agents of FPMT and the Kadampa Center and students,

including the obvious and lengthy ongoing inappropriate relationship between Sangpo and Stafford, including through online WeChat conversations;

f.  Failing to adopt, implement and/or follow reasonable policies that would have prevented Sangpo from being able to have unfettered and unsupervised access to groom and molest Stafford;

g.  Ignoring physical affection that Sangpo inappropriately lavished on the minor Stafford in full view of FPMT COO Francois Lecointre and his wife, Violette;

h.  Ignoring Lama Zopa's successful efforts to isolate increasingly distressed Stafford from her peers and putting her at further risk of sexual abuse;

i.  Failing to fully and reasonably investigate complaints of Dagri's abuse of other FPMT members, creating a culture of no accountability within the organization;

j.  Failing to take notice of the excessive amount of time that Sangpo spent with Stafford and failing to investigate circumstances surrounding his interactions with Stafford;

k.  Failing to realize Sangpo's incompetency for his position based upon his conduct and failing to take appropriate actions in regard to his competency;

l.  Failing to use ordinary care in the oversight and supervision of Sangpo, resulting in a failure to detect the long-term inappropriate relationship that Sangpo had with Stafford;

m.  Failing to report Sangpo's conduct to the appropriate authorities as required by the North Carolina General Statutes;

n.  Failing to report, respond, and reasonably investigate Gyaltsen's assault of Stafford at the Milarepa Center and in front of several FPMT members;

o.  Failing to respond appropriately to the 2011 incident where an FPMT member stalked Stafford, expressing a desire to have sex with her; and

p.  As otherwise will be proven through discovery and trial.

167.    As a direct and proximate result of the negligence of FPMT and the Kadampa Center, as alleged herein, Stafford has sustained severe psychological injuries, personal injuries, and egregious emotional and physical pain and suffering.

168.    The above-described acts and omissions of FPMT and the Kadampa Center constitute a conscious indifference to the rights and safety of their vulnerable members, including Stafford, which is gross negligence.

169.    The above-described acts and omissions FPMT and the Kadampa Center constitutes willful and wanton conduct and demonstrates a reckless disregard for the rights and safety of their vulnerable members, including Stafford, which allows for the recovery of punitive damages from each of these Defendants in the amount of three times compensatory damages or $250,000, whichever amount is greater.

170.    FPMT and the Kadampa Center are thereby liable to the Plaintiffs for their special and general damages, as well as punitive damages.

### THIRD CLAIM FOR RELIEF - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**North Carolina Common Law**

*Plaintiff against FPMT and the Kadampa Center*

171.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

172.    FPMT and the Kadampa Center knew or should have reasonably known that as a result of their egregious, extreme and outrageous conduct that Stafford would be subjected to severe mental and emotional distress, and pain and suffering.

29

173.    FPMT and the Kadampa Center acted intentionally, willfully, maliciously and purposely, with the intention to inflict severe emotional distress upon Stafford, or with reckless disregard of the probability of causing Stafford severe emotional distress.

174.    The aforementioned conduct of FPMT and the Kadampa Center constitutes intentional infliction of emotional distress, and as a result of these acts, Stafford has suffered severe and grievous emotional distress, anxiety, nervousness, humiliation, pain and suffering, and physical manifestations thereof.

175.    By intentionally inflicting emotional distress upon Stafford, FPMT and the Kadampa Center are liable to Stafford for her special and general damages, as well as punitive damages.

**FOURTH CLAIM FOR RELIEF - BREACH OF FIDUCIARY DUTIES**

**North Carolina Common Law**

***Plaintiff against FPMT and the Kadampa Center***

176.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

177.    At all times relevant hereto, FPMT and the Kadampa Center owed fiduciary duties as a result of the long relationship between them and Stafford that resulted in moral, social and personal relationships of trust and confidence, such that Stafford justifiably relied upon the belief that FPMT and the Kadampa Center would act in her best interests.  These duties included the duty of good faith, in addition to the duty to act with integrity of the strictest kind.

178.    FPMT and the Kadampa Center breached these fiduciary duties by acting without good faith. FPMT abused its relationship with Stafford by grooming her and leaving her vulnerable to sexual abuse by Sangpo. Even though FPMT was aware of Sangpo's advances towards Stafford,

aware that he was spending time with her and communicating with her, unsupervised, and aware that Stafford had been sexualized by at least one other member of the FPMT community, FPMT did not act in good faith and protect Stafford from sexual abuse. Indeed, the environment created by Dagri and Lama Zopa actively facilitated a culture of impunity towards sexual abuse, which further left Stafford vulnerable to Sangpo's assaults.

179.    FPMT and the Kadampa Center's breach of fiduciary duties was a proximate cause of the damages to Stafford.

## FIFTH CLAIM FOR RELIEF - FEDERAL SEX TRAFFICKING

### (18 U.S.C. §§ 1591, 1594 and 1595)

*Direct and Vicarious Liability – Plaintiff against FPMT Defendants*

180.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

181.    In violation of 18 U.S.C. §§ 1591(a)(1) and 1595 and/or 18 U.S.C. § 1594(a) and 1595, FPMT Defendants knowingly, in or affecting interstate or foreign commerce, recruited, enticed, and obtained, or attempted to recruit, entice, and obtain, Stafford knowing that she had not attained the age of 18 years and would be caused to engage in a commercial sex act.

182.    In addition or in the alternative, in violation of 18 U.S.C. §§ 1591(a)(1) and 1595 and/or 18 U.S.C. §§ 1594(a) and 1595, Sangpo and Gyaltsen in their capacity as agents of FPMT Defendants and in performance of their agency duties for FPMT Defendants, knowingly, in or affecting interstate or foreign commerce, recruited, enticed, and obtained, or attempted to recruit, entice, and obtain, Stafford knowing that she had not attained the age of 18 years and would be caused to engage in a commercial sex act.

183. FPMT's actions affected interstate commerce by, *inter alia*, operating an organization that crossed state lines and recruited volunteers, employees, students and other members across state borders and hosting events that occurred across state borders. FPMT advertises itself nationally and internationally, including through channels of inter-state communication such as the internet.

184. FPMT Defendants knowingly recruited, enticed, obtained and attempted to recruit, entice and obtain Plaintiff knowing that Stafford had not attained the age of 18 years and would be caused to engage in a commercial sex act, by, *inter alia,* recruiting Stafford, offering her parents high positions with the organization, heralding Stafford as a "tulku" and someone in a powerful position within the organization, offering her access to exclusive lessons and to exclusive private quarters during retreats and repeatedly placing her in the center of attention at FPMT.

185. FPMT Defendants knew or were in reckless disregard of the fact that Stafford would be caused to engage in commercial sex acts. FPMT Defendants knew that their senior teachers had been accused of sexual assault. FPMT Defendants further knew or were in reckless disregard of the fact that their lackluster response to these accusations would create a culture of impunity to sexual abuse at FPMT. FPMT Defendants further knew, or should have known, that Sangpo had taken an outsized interest in a minor child and that Stafford, a minor child, was frequently permitted and encouraged to spend time with adult men in close and private quarters without supervision. FPMT Defendants also knew that at least one male, adult member of FPMT had taken a sexual interest in Stafford and stalked her.

186. Plaintiff's sex acts with Gyaltsen and Sangpo were **commercial** according to the statutory definition because they were induced in exchange for benefits that had significant value

to her, including spiritual status, prestige, superior accommodations, meals and special access to Lama Zopa, none of which was available to regular members. For members of FPMT, access, status, and approval are as valuable and as tangible as any currency.

187. As a result of FPMT Defendants' conduct, Plaintiff suffered the damages described herein.

188. Plaintiff is entitled to compensatory and punitive damages, and restitution in amounts to be determined at trial, together with injunctive relief, reasonable attorneys' fees and the costs of this action, and any other relief deemed appropriate.

## SIXTH CLAIM FOR RELIEF: FEDERAL SEX TRAFFICKING (BENEFICIARY)

### (18 U.S.C. §§ 1591, 1594 and 1595)

### *Beneficiary Liability – Plaintiff against FPMT*

189. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

190. As alleged above, in violation of 18 U.S.C. §§ 1591(a)(1) and 1595 and/or 18 U.S.C. §§ 1594(a) and 1595, Sangpo and Gyaltsen knowingly, in or affecting interstate or foreign commerce, recruited, enticed, and obtained, or attempted to recruit, entice, and obtain, Stafford knowing that she had not attained the age of 18 years and would be caused to engage in a commercial sex act.

191. FPMT benefited from Sangpo and Gyaltsen's services to Lama Zopa and Dagri, respectively. Attendants perform a range of roles that are of great benefit to FPMT leaders like Lama Zopa and Dagri, and their services are invaluable to ensuring the smooth functioning of FPMT.

33

192.    FPMT participated in a venture with Sangpo and Gyaltsen. FPMT ensured that Stafford was housed in private quarters with Sangpo while at the Kadampa Center, facilitated and encouraged Sangpo's access to Stafford, and allowed Sangpo to spend extended and private time with Stafford. FPMT also organized and encouraged Stafford's private audiences with Dagri, which involved her first going through Gyaltsen. All of FPMT's acts were done for the mutual benefit of FPMT, Gyaltsen, and Sangpo, to benefit from both Stafford's popularity within the organization as a "tulku" and from her availability for commercial sex.

193.    As outlined above, FPMT, at minimum, should have known that Sangpo and Gyaltsen were engaging in violations of the TVPA.

194.    As a result of Defendants' conduct, Plaintiff suffered the damages described herein.

195.    Plaintiff is entitled to compensatory and punitive damages, and restitution in amounts to be determined at trial, together with injunctive relief, reasonable attorneys' fees and the costs of this action, and any other relief deemed appropriate.

### SEVENTH CLAIM FOR RELIEF – NEGLIGENCE AND GROSS NEGLIGENCE

**Vermont Common Law**

***Plaintiff against FPMT and the Milarepa Center***

196.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

197.    While employed and acting as an agent of FPMT and the Milarepa Center, Gyaltsen molested Plaintiff.

198.    By the time Plaintiff was assaulted, FPMT and the Milarepa Center were aware of the foreseeable risk of sexual harm to Stafford because, *inter alia*:

a. FPMT and the Milarepa Center were aware that a senior teacher within its community, Dagri, posed a risk of sexual harm to FPMT members and students and Milarepa Center attendees;

b. FPMT and the Milarepa Center were aware that Dagri had been credibly accused of sexual abuse on at least two occasions by 2011;

c. FPMT and the Milarepa Center were aware, specifically, that Dagri utilized his position as FPMT teacher and spiritual guide in order to make sexual advances on women under the guise of offering spiritual advice; and

d. FPMT and the Milarepa Center were further aware that Stafford, then eleven, had already been inappropriately sexualized by at least two FPMT adult male members.

199.    FPMT and the Milarepa Center demonstrated negligence and gross negligence in, *inter alia*:

a. Failing to apprise any reasonable person of the awareness of credible accusations of sexual abuse by a respected senior teacher;

b. Failing to implement safeguards to prevent sexual contact between children and adult male FPMT teachers and attendees.

c. Choosing to permit employees, including Dagri and his attendants, to remain in positions of trust and authority despite knowing the credible risk of sexual abuse posed by them;

d. Choosing to allow employees, including Dagri and his attendants, unfettered access to a minor child who had already been sexualized within the organization;

e. Failing to put into place any system or procedure to supervise or monitor employees to ensure they did not sexually abuse children;

f. Failing to ensure Dagri and his attendants did not have access to vulnerable minors who they could sexually exploit;

g. Creating an environment where sexual abuse could thrive and be committed with impunity; and

h.   Failing to intervene when Gyaltsen abused Plaintiff, and failure to subsequently address the harm it caused, despite it happening in full view of FPMT members, including FPMT's COO Francois Lecointre.

200.   The choices FPMT and the Milarepa Center made with respect to Dagri and Gyaltsen and their regime of sexual abuse were grossly negligent, reckless, and done with a conscious disregard of a substantial, unreasonable and unjustifiable risk of harm to Plaintiff.

201.   FPMT and the Milarepa Center were grossly negligent and failed to exercise even the slightest degree of care in their supervision and control of Dagri and Gyaltsen, thereby enabling Gyaltsen to abuse Plaintiff knowing that he was immunized from the consequences.

202.   FPMT and the Milarepa Center's conduct was done willfully and recklessly and without regard for the rights of Plaintiff, was a heedless and palpable violation of their duty to Plaintiff, and as such constitutes gross negligence.

203.   Gyaltsen's abuse of Plaintiff constituted lewd and lascivious conduct with a child.

204.   As a result of Defendants' conduct, Plaintiff was sexually abused and suffered the damages described herein.

## EIGHTH CLAIM FOR RELIEF – BEACH OF FIDUCIARY DUTIES

### Vermont Common Law

### *Plaintiff against FPMT and the Milarepa Center*

205.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

206.   For the reasons articulated above, Plaintiff had a special relationship with FPMT and the Milarepa Center such that FPMT and the Milarepa Center owed Plaintiff a duty to prevent Gyaltsen from harming FPMT members, including children such as Stafford.

36

207. At all times relevant herein, FPMT and the Milarepa Center had a special and unique relationship with Plaintiff that gave rise to a fiduciary obligation.

208. For example, senior leaders within FPMT and the Milarepa Center, including FPMT's founder, Lama Zopa, lavished inordinate attention on Plaintiff. Lama Zopa singled out Plaintiff as a "tulku." He instructed Stafford's family to frequently send her to travel within FPMT's care and to mingle and be housed with FPMT adult members, including in his private cabin. FPMT and its senior leadership gave Stafford special privileges within the organization, and private audience with its senior leaders and teachers, such as Lama Zopa and Dagri, and their attendants.

209. FPMT and the Milarepa Center expressly and impliedly represented that FPMT senior teachers and employees, including attendants to senior teachers, were men whom FPMT members could trust with religious, moral, educational, emotional and physical care of Plaintiffs.

210. FPMT and the Milarepa Center breached their duty of trust and confidence to Plaintiff by, *inter alia*:

a. Failing to adequately supervise, control, investigate or discipline Dagri for credible allegations of sexual abuse, thereby creating a culture of impunity for sexual abuse among Dagri and his employees;

b. Failing to warn Plaintiff of the credible risk of sexual abuse posed by Dagri and his attendants;

c. Failing to disclose facts in its possession that Dagri was credibly accused of sexual abuse to Plaintiff;

d. Failing to protect Plaintiff despite the fact that adult male members had sexualized her;

e. Failing to protect Plaintiff from exposure to sexual abuse and dangerous employees;

37

f.   Failing to provide an environment for Plaintiff to be free from sexual abuse.

211.   Defendants' conduct was done willfully and recklessly and without regard for the rights of Plaintiff, was a gross, heedless, and palpable violation of their duty to Plaintiff.

212.   As a result of Defendants' conduct, Plaintiff was sexually abused and suffered the damages described herein.

## NINTH CLAIM FOR RELIEF – FAILURE TO PREVENT HARM

### Vermont Common Law

### *Plaintiff against FPMT and the Milarepa Center*

213.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

214.   As set out above, Plaintiff had a special relationship with FPMT and the Milarepa Center. Plaintiff was a minor child who had been vaulted into special status within FPMT and the Milarepa Center.

215.   FPMT and the Milarepa Center at all material times, through its teachings and relationship with Plaintiff and her family, purposefully created an atmosphere of deference, trust and respect for FPMT senior teachers and attendants.

216.   Plaintiff was at all relevant times a minor child with a high degree of vulnerability who was not able to safeguard herself. Gyaltsen was allowed unsupervised and unfettered access to molest Plaintiff in a public hallway with impunity, while no FPMT members intervened.

217.   Therefore, FPMT and the Milarepa Center had a special relationship with Plaintiff such that FPMT and the Milarepa Center that gave Plaintiff a right of protection. FPMT and the Milarepa Center owed Plaintiff a duty of reasonable care with regard to the risk that its agents, including Gyaltsen, would harm Plaintiff.

218. As set out above, the risk that Plaintiff would be sexually harmed by an adult FPMT member, and the risk that Dagri's attendant would harm Plaintiff, were reasonably foreseeable.

219. As also set out above, FPMT and the Milarepa Center did not exercise reasonable care in addressing these foreseeable risks.

220. Defendants' conduct was done willfully and recklessly and without regard for the rights of Plaintiff, was a gross, heedless, and palpable violation of their duty to Plaintiff.

221. As a result of Defendants' conduct, Plaintiff was sexually abused and suffered the damages described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray of the Court as follows:

a. For judgment against the Defendants, jointly and severally, for compensatory damages in an amount in excess of this Court's jurisdictional threshold of $25,000.00;

b. For punitive and/or treble damages against the Defendants in the maximum amount permitted by law;

c. That Plaintiff be awarded reasonable attorneys' fees from the Defendants to the extent permitted by law;

d. Interest upon all compensatory damages awards recovered by Plaintiff in this action;

e. That the costs of this action be taxed against the Defendants;

f. That this matter be tried by jury; and

g. That the Plaintiff has such other and further relief to which she may be entitled and which this Court deems just and proper.

### SIGNATURE PAGE TO FOLLOW

Respectfully submitted, this the 21st day of October,

HOWARD STALLINGS LAW FIRM

By: /s/ Robert H. Jessup_____
Robert H. Jessup (State Bar No. 42945)
Post Office Box 12347
Raleigh, North Carolina 27605
rjessup@howardstallings.com
*Attorneys for Plaintiff*

MCALLISTER OLIVARIUS

Dr. John F.O. McAllister*
Carol Merchasin*
Meghna Sridhar*
641 Lexington Avenue, 13th Floor
New York, New York 10022
jmcallister@mcolaw.com
cmerchasin@mcolaw.com
msridhar@mcolaw.com
*Attorneys for Plaintiffs*
*Anticipated Admittance via Pro Hac Vice*

40